# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF INDIANA
# HAMMOND DIVISION

| | |
|---|---|
| JUDITH ANN WINFIELD, ) | |
| ) | |
| Plaintiff, ) | |
| ) | Cause No. 2:11-cv-432-PPS |
| v. ) | |
| ) | |
| COMMISSIONER OF SOCIAL SECURITY, ) | |
| ) | |
| Defendant. ) | |

## **OPINION AND ORDER**

On April 4, 2006, Judith Winfield was driving home from her bible study group when she was caught in a crossfire. She was shot in the chest and subsequently spent over a month in the hospital. Bullet fragments remain in her chest to this day, and she says that she is in a constant state of pain. This is not the only symptom that she experiences. She also suffers from post-traumatic stress disorder, anxiety and depression, though there's a dispute over the severity of these mental impairments.

Winfield says that she has been unable to work since her shooting, and she filed an application for social security disability benefits shortly after her discharge from the hospital in May 2006. That application ultimately was denied at all stages of the administrative process, and she now seeks review in this Court.

There is no mistaking the fact that Winfield's injury were awful, and I have no doubt that her scars – both physical and emotional – are profound. On the other hand, the ALJ made a reasonably detailed and well-supported determination that her current impairments do not prevent her from performing the same sedentary work that she did prior to being shot.

1

Attempting to reconcile these competing facts could be a difficult task, but because there is a preliminary issue that mandates remand, I need not do it. The ALJ's mistake when evaluating Winfield's residual functional capacity as required by social security regulations is that he limited his analysis to Winfield's physical impairments, and he ignored her mental ones. It's true, of course, that he previously found those mental impairments to be mild. But the agency regulations – and cases interpreting and applying them – are clear that the residual functional capacity determination must take into account *all* impairments, regardless of severity. The ALJ simply didn't do that here. Therefore, the matter is **REMANDED** back to the ALJ for further proceedings consistent with this decision.

## BACKGROUND

Winfield worked as a customer service manager at a newspaper until 2003, and then as a telemarketer until December 2005, when her employer closed up shop. (R. at 40-43.) She hasn't worked since. (*Id.* at 16.) Winfield says that her continued unemployment is the result of a myriad of physical and mental impairments, which have rendered her too disabled to work. (*Id.* at 16, 18.)

There's no doubt that she does have some limitations. As I mentioned above, on April 4, 2006, Winfield was an innocent bystander in a horrific shooting incident. (*Id.* at 44-45.) She was driving home from a bible study group, when she was caught in a crossfire. (*Id.*) Winfield was hit in the chest, and paramedics rushed her to the intensive care unit (*Id.* at 451-54.) Winfield's treating physicians feared an imminent respiratory failure, so they inserted a chest

tube to resuscitate[1] and stabilize her. (*Id.* at 452.) Her physicians' efforts ultimately were successful (though she did develop deep vein thrombosis while in the ICU), and she eventually recovered and was released on May 5, 2006. (*Id.* at 18.)

Winfield submitted applications for Title II disability and disability insurance benefits and Title XVI supplemental security income almost immediately upon her release from the hospital. (*Id.* at 14.) Her primary physical impairment was the gunshot wound and the still-present bullet fragments lodged in her chest, which limits her left shoulder mobility and caused her pain. (*Id.* at 16.) Winfield also said that she suffers from obesity, headaches, hypertension, and osteoarthritis and arthritis in her left knee and ankle. (*Id.*)

Winfield further identified a number of mental conditions during the administrative proceedings, most of which seem to be related to the gunshot incident. These include post-traumatic stress disorder, anxiety and depression. (*Id.* at 16-17.) A psychological consulting examiner formally diagnosed her with depressive disorder and assigned her a global assessment of functioning score of sixty, which (barely[2]) puts her in the "moderate symptoms" category. (*Id.* at 17.)

Winfield's disability claims were initially denied by the SSA, and they were denied again on reconsideration. (*Id.* at 14.) Winfield requested and received a hearing before an ALJ. (*Id.* at

---

[1] It's unclear from the record whether Winfield actually went into respiratory or heart failure before intubation. Regardless, her condition at that point was grave.

[2] The ALJ characterizes a GAF score of sixty as indicative of mild-to-moderate symptoms. Winfield objects that this just isn't correct – she says that a score of sixty isn't mild, it's moderate. She's right. A sixty is the highest (*i.e.*, least severe) GAF score in the moderate category, but it's still in that category. *See* Global Assessment of Functioning (GAF) Scale (*available at* http://depts.washington.edu/washinst/Resources/CGAS/GAF%20Index.htm).

14-21.) In his decision, the ALJ acknowledged that Winfield's physical impairments were severe. (*Id.* at 16.) With respect to her mental impairments, however, the ALJ found that they only caused her mild limitations, and therefore were mild. (*Id.* at 16-17.)

Continuing with his analysis, the ALJ evaluated the effect of Winfield's physical impairments on her residual functional capacity. He found that she would be capable of performing sedentary work (mostly sitting, with occasional walking and light lifting), despite the lingering effects of the gunshot wound on her mobility. (*Id.* at 18-20.) The ALJ further noted that with respect to Winfield's headaches and hypertension, the former was not severe enough to require medical treatment, and the latter was well-controlled with medication. (*Id.* at 19.) Notably, his determination of Winfield's residual functional capacity didn't include any consideration – or even mention, really – of Winfield's non-severe mental impairments (*i.e.*, PTSD, anxiety and depression); instead, it was solely confined to her physical impairments.

The ALJ concluded by finding that Winfield was capable of working in her former occupation as a customer service representative supervisor. (*Id.* at 20.) As such, the ALJ found that she was not disabled. (*Id.* at 20-21.) Winfield requested a review of the ALJ's decision by the SSA, but the decision was upheld. (*Id.* at 5-7.) This appeal followed. (DE 1.)

**DISCUSSION**

If the ALJ's findings of fact are supported by "substantial evidence" then they must be sustained. *See* 42 U.S.C. § 405(g). Substantial evidence consists of "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Nelms v. Astrue,* 553 F.3d 1093, 1097 (7th Cir. 2009) (*quoting Richardson v. Perales*, 402 U.S. 389, 399-400 (1971)). Review of the ALJ's findings is deferential. *See Overman v. Astrue*, 546 F.3d 456, 462 (7th Cir.

4

2008). In making a substantial evidence determination, I will review the record as a whole, but will not re-weigh the evidence or substitute my judgment for that of the ALJ. *Id*.

"Although this standard is generous, it is not entirely uncritical." *Id*. at 462 (*quoting Steele v. Barnhart,* 290 F.3d 936, 940 (7th Cir. 2002)). I must ensure that the ALJ has built a "logical bridge" between the evidence and the result. *See Getch v. Astrue*, 539 F.3d 473, 481 (7th Cir. 2008). However, if reasonable minds could differ on whether a claimant is disabled, I must affirm the Commissioner's decision denying benefits. *See Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008).

Winfield asks me to reverse the ALJ decision from below on multiple grounds. First, she says that it uses impermissible boilerplate to dismiss various of her statements as not credible. (DE 17 at 8-12.) Second, she argues that the ALJ ignored her reports of pain stemming from her chest wound and her arthritis in her knee. (*Id.* at 12-14.) Third, Winfield attacks the ALJ's assessment of her residual functional capacity for two reasons. She contends that he erred when he found her mental impairments to be non-severe, and that even if he didn't, he failed to consider those non-severe impairments when determining her residual functional capacity. (*Id.* at 14-20.) Finally, Winfield says that the ALJ misidentified her prior position as a newspaper customer service manager when he used a code that corresponds with the radio/television broadcasting or telephone and telegraph industries. (*Id.* at 20-21.)

It is important to note that Winfield only needs to prevail on one of these arguments. If any of them are correct, then I must remand the matter back to the ALJ for additional proceedings. And in this regard, I think that Winfield is pretty clearly right on at least one of her claims – that the ALJ fundamentally erred when he failed to consider her non-severe mental

impairments when assessing her residual functional capacity. Therefore, I have no choice but to remand this case back to him.

More on that in a second. First, I need to explain the terminology that I'll use. Federal regulations – specifically, 20 CFR §§ 404.1520 and 416.920 – mandate that an ALJ undertake a five step process when determining whether an individual is disabled. Each stage of the analysis is commonly referred to as a "Step" (*i.e.*, "Step One" through "Step Five"). The Steps that are at issue in this case are Step Two (determining whether an impairment is severe), Step Four (assessing the residual functional capacity) and Step Five (determining capability to do other work).

With respect to Winfield's mental impairments, she essentially makes a Step Two and a Step Four argument. As for the first, she asserts that the ALJ incorrectly found her PTSD, depressive disorder and anxiety to be non-severe. She may have a point. As I noted above, her GAF score of sixty indicates that she has moderate symptoms of mental impairment and/or moderate difficulty in social functioning. It's true, of course, that if her score was a single point higher then she would fall in the "mild" category – but it's not.

Yet at the end of the day it doesn't matter. The law is settled that once an ALJ determines that a disability claimant is suffering from *any* severe impairment, that claimant will clear the Step Two hurdle. *See Castile v. Astrue*, 617 F.3d 923, 927 (7th Cir. 2010); *Maziarz v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987); *Masch v. Barnhart*, 406 F. Supp. 2d 1038, 1053-54 (E.D. Wis. 2005); *Daniels v. Astrue*, No. 10 C 5820, 2011 WL 3439269, at *8 (N.D. Ill. Aug.4, 2011); *Tocco v. Astrue*, No. 3:07-CV-118, 2008 WL 4936876, at *6 (N.D. Ind. Nov. 14, 2008). In this case, the ALJ found that Winfield is suffering from several severe

physical impairments, including (most prominently) a loss of shoulder mobility as a result of her 2006 gunshot injury and the bullet fragments that still reside in her chest and shoulder. So it doesn't matter at the Step Two stage whether he was right when he determined that her mental impairments to be non-severe. He was going to move on to Step Three and beyond under any circumstance, so any error would be harmless.

The Step Four argument is another matter entirely. Put simply, the ALJ in this case was required to fully consider Winfield's mental impairments when assessing her residual functional capacity, regardless of their severity. Indeed, federal regulations specify that when the ALJ assesses a claimant's residual functional capacity, *all* impairments – both severe and non-severe – must be considered. *See* 20 C.F.R. § 404.1523. And for good reason. Even a mild impairment can put a disproportionately greater strain on a person who concurrently is suffering from a more severe affliction. *See Parker v. Astrue*, 597 F.3d 920, 923 (7th Cir. 2010); *Villano v. Astrue*, 556 F.3d 558, 563 (7th Cir. 2009). It's the combination of the maladies that must be considered, and "[a] failure to fully consider the impact of non-severe impairments *requires reversal*." *Denton v. Astrue*, 596 F.3d 419, 423 (7th Cir. 2010) (emphasis added); *accord Golembiewski v. Barnhart*, 322 F.3d 912, 918 (7th Cir. 2003).

The question in this case, then, is whether the ALJ *fully* considered Winfield's mental impairments when he assessed her residual functional capacity. That's not very difficult to answer. From what I can tell, there's not even a single reference to – much less any consideration of – Winfield's mental impairments or resulting limitations in the ALJ's Step Four analysis. What makes this so curious is that he previously acknowledged during his Step Two assessment that Winfield was suffering from depressive disorder and scored in the "moderate"

7

symptoms or difficulties category on the GAF.  He even found that Winfield was limited in three of the four broad functional areas used to evaluate mental disorders, though he found the limitations to be mild.  (R. at 17.)  So the ALJ knew that Winfield was suffering from mental impairments that caused her some functional limitations.  He just ignored them when determining her residual functional capacity.

This failure is fatal to the ALJ's decision and necessitates a remand of this matter.  *See Villano v. Astrue*, 556 F.3d at 563 (holding that the ALJ's decision should be vacated when he failed to consider a claimant's non-severe depression); *Richards v. Astrue*, 370 Fed. App'x 727, 732-33 (7th Cir. 2010) (same).

## CONCLUSION

Therefore, and for the reasons set forth herein, the matter is **REMANDED** back to the agency for further proceedings consistent with this opinion.

**SO ORDERED**.

ENTERED: February 25, 2013.

s/ Philip P. Simon<br>
PHILIP P. SIMON, CHIEF JUDGE<br>
UNITED STATES DISTRICT COURT